Richard Johnston - SBN 124524
131-A Stony Circle, Suite 500
Santa Rosa, California 95401
Telephone (707) 577-7422
Facsimile (707) 837-9532

Attorney for Plaintiff
Arminda Y. Madrid

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMINDA Y. MADRID,<br><br>   Plaintiff,<br><br>  vs.<br><br>DIONEX CORPORATION LONG TERM DISABILITY PLAN,<br><br>   Defendant.<br>_____ | Case No. CV 07-02839 CRB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES SUBMITTED BY MADRID IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER RULE 56 OR, IN THE ALTERNATIVE, FOR JUDGMENT UNDER RULE 52**<br><br>**Date:**  February 29, 2008<br>**Time:**  10:00 a.m.<br>**Courtroom:** 8, 19th Floor |

_____
POINTS AND AUTHORITIES SUPPORTING
PLAINTIFF'S MOTION FOR JUDGMENT
UNDER RULE 56 OR RULE 52

**Table of Contents**

I.    Introduction ................................................................. 1

II.   Pertinent Policy Provisions ............................................... 1

III.  Factual background ...................................................... 2

      A.   Ms. Madrid's employment with Dionex ................................ 2

      B.   Ms. Madrid's medical issues and treatment ........................ 3

           1.   Ms. Madrid is disabled due to fibromyalgia and the associated chronic
                pain ............................................................. 3

           2.   Ms. Madrid is referred for psychological counseling and briefly undergoes
                treatment ....................................................... 4

      C.   Ms. Madrid's LTD claim to RS ...................................... 5

           1.   In July 2002, RS denies Ms. Madrid's claim, asserting she was not
                disabled ........................................................ 6

           2.   In November 2002, RS approves benefits but limits them to 24 months
                under the limitation for mental and nervous disorders .............. 7

           3.   In December 2002, RS changes its position and includes fibromyalgia as
                a disabling diagnosis, maintaining it is subject to a 24-month limitation for
                self-reported conditions ........................................ 8

           4.   In April 2003, RS limits Ms. Madrid's benefits to 24 months under
                limitations for self-reported conditions; neck/back; and chronic fatigue
                syndrome ........................................................ 9

           5.   In July 2003, RS asserts various bases for claim termination:
                mental/nervous disorder; self-reported condition; neck/back; chronic
                fatigue syndrome; PEC exclusion; Ms. Madrid may not be disabled .... 9

                a.  Ms. Madrid's April 2003 appeal ............................ 9

                b.  William Scott Hauptman, M.D. ............................. 10

                c.  Dr. Hauptman's report on Ms. Madrid's claim ............. 12

                d.  RS upholds the termination of benefits ................... 14

           6.   In December 2003, RS again upholds the termination of Ms. Madrid's
                benefits, citing only the mental/nervous limitation ............... 15

7.    In August 2004, RS upholds the termination of Ms. Madrid's benefits invoking the mental/nervous, neck/back, and chronic fatigue policy limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    The court should afford scant deference to RS' determination . . . . . . . . . . . . 19

B.    Ms. Madrid's mental and nervous diagnosis does not and cannot mean she is ineligible for benefits for an entirely distinct physical disability . . . . . . . . . . . . 21

C.    Ms. Madrid's fibromyalgia is not a condition of the neck and back . . . . . . . . . 24

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

_Cases_

*Abatie v. Alta Life & Health Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (*en banc*) . . . . . . . . . . 19-21

*Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233 (D.Mass. 2003) . . . . 11, 12, 20

*Dames v. Paul Revere Life Ins. Co.*, 12 Fed.Appx. 505 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . 17

*Gatti v. Reliance Standard Life Ins. Co.*, 2006 WL 664422 (D.Ariz.) . . . . . . . . . . . . . . . . . . . 22

*Gunn v. Reliance Standard Life Ins. Co.*, 399 F.Supp.2d 1095 (C.D.Cal. 2005) (vacated on other grounds, 235 Fed.Appx. 553, 2007 WL 2326266 (9th Cir.)) . . . . . . . . . . . . . . . . . . 11, 12

*Henry v. Home Ins. Co.*, 907 F.Supp. 1392 (C.D.Cal 1995) . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) (*en banc.*) . . . . . . . . . . . . . . . . 1

*Mitchell v. Aetna Life Ins. Co.*, 359 F.Supp.2d 880 (C.D.Cal 2005) . . . . . . . . . . . . . . . . . . . 19

*Mogck v. UNUM Life Ins. Co. of America,* 292 F.3d 1025 (9th Cir. 2002) . . . . . . . . . . . . . . . 22

*Omasta v. The Choices Benefit Plan*, 352 F.Supp.2d 1201 (D.Utah 2004) . . . . . . . . . . . . . 11

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, - F.3d -, 2008 WL 80704 (9th Cir.) . 17, 19, 21

*Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y. 2005) . . . . . . . . . . 23, 24

*Smetana v. Reliance Standard Life Ins. Co.*, 2003 WL 22594263 (E.D.Pa.) . . . . . . . . . . . . . 11

*Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956 (C.D.Cal. 2005) . . . . . . . . . . . . . . . . . . . . 17

_Statutes_
29 USC §1001 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

_Rules_
Fed.R.Civ.P. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

_Regulations_
29 CFR §2560.503-1(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22


_Other Authorities_
Langbein, <u>Trust Law as Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA</u>, 101 NW. U.L.Rev. 1315 (2007) . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (2d) of Trusts, §187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    Introduction

By this motion, plaintiff Arminda Madrid seeks summary judgment, or in the alternative judgment under Rule 52 of the Federal Rules of Civil Procedure, *see Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-1095 (9th Cir. 1999) (*en banc.*), against defendant Dionex Corporation Long Term Disability Plan.  The Plan, governed by the Employee Retirement Income Security Act, 29 USC §1001 *et seq.*, was fully insured by a group disability policy issued and administered by Reliance Standard Life Insurance Company.  For ease of reference we refer to the defendant as "RS."

Ms. Madrid was disabled by fibromyalgia.  She was also diagnosed with mental or nervous conditions, and RS seized on that diagnosis to limit her benefits to 24 months under a policy limitation.  What RS refused to acknowledge, however, was that Ms. Madrid was, and remains, totally disabled by fibromyalgia, and for that benefits remain payable under the RS policy.  The court should enter judgment accordingly.

II.    Pertinent Policy Provisions

The RS policy provided disability benefits "if an Insured ... is Totally Disabled as the result of a Sickness or Injury...," AR 18,[1] and defines "Totally Disabled" in pertinent part thusly: "...as a result of an Injury or Sickness ... an Insured cannot perform the material duties of his/her regular occupation. ... after a Monthly Benefit has been payable for 24 months, an Insured cannot perform the material duties of any occupation [which is defined as] one that the Insured's education, training or experience will reasonably allow."

The policy also contained limitations, which are the focus of this litigation.  Regarding mental and nervous conditions, the policy provided in pertinent part:

**MENTAL OR NERVOUS DISORDERS:** Monthly Benefits for Total Disability caused

---

[1]"AR" citations are to the administrative record produced by RS in connection with its initial disclosures.  We are advised by RS counsel that a copy of the record is to be lodged with the court in connection with these proceedings.

by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months....

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:
(1)    bipolar disorder (manic depressive syndrome);
(2)    schizophrenia;
(3)    delusional (paranoid) disorders;
(4)    psychotic disorders;
(5)    depressive disorders;
(6)    anxiety disorders;
(7)    somatoform disorders (psychosomatic illness);
(8)    eating disorders; or
(9)    mental illness.

AR 21.

The policy also limited benefits for the following, which we shall refer to as the "neck/back" limitation:

Monthly Benefits will be limited to a total of 24 months in the Insured's lifetime for all Total Disabilities caused or contributed to by musculoskeletal and connective disorders of the neck and back, including any disease, disorder, sprain and strain of the joints and adjacent muscles of the cervical, thoracic and lumbosacral regions and their surrounding soft tissue.

AR 22.

The policy also contained a limitation for chronic fatigue syndrome:

Monthly Benefits will be limited to a total of 24 months in the Insured's lifetime for all Total Disabilities caused or contributed to by: ... Chronic fatigue syndrome....

*Id.*

III.    Factual background

A.    Ms. Madrid's employment with Dionex

Ms. Madrid commenced her employment with Dionex on January 2, 2001.  AR 76.  She worked there as payroll manager until May 30, 2001, *id.*, when her disability precluded her from working further. AR 76.  As she later described her occupational duties to RS, "Since I am dealing with paychecks, it is a must to stay focused with full concentration in my job duties which requires an average of 10 hrs. per day of work hours."  AR 83.

B.    Ms. Madrid's medical issues and treatment

1.    Ms. Madrid is disabled due to fibromyalgia and the associated chronic pain

Ms. Madrid suffered over the course of the relevant time period from fibromyalgia and the associated chronic pain. On August 8, 2000, her primary treating physician, Seema Rikhy, M.D., noted her fibromyalgia was acting up, AR 587, and that she could not attend work. AR 595. By May 2001, Ms. Madrid's fibromyalgia continued to act up, AR 585; she was also having a lot of pain in her neck, radiating to her shoulders bilaterally. AR 584. On May 22, Dr. Rikhy noted Ms. Madrid had a lot of pain all over her body, especially in the neck region. AR 583.

On June 2, 2001, Ms. Madrid appeared at the Emergency Room at Washington Hospital; among her complaints were that she hurt all over and she had not been able to sleep for four days. AR 610. By June 11, Dr. Rikhy noted Ms. Madrid was suffering from headaches and that her whole body was aching. AR 630. On June 21, Dr. Rikhy noted her muscles were still hurting. AR 631.

On July 9, 2001, Dr. Rikhy noted Ms. Madrid had aches and pain all over, and needed to take Ativan in order to sleep. AR 632. On July 13, according to Dr. Rikhy, Ms. Madrid's muscles were still hurting all over. AR 633. By August 13, 2001, Ms. Madrid, again according to Dr. Rikhy, was having a lot of pain all over her body, especially in the arms and legs. AR 634. That notwithstanding, Ms. Madrid was going to attempt a return to work part time. *Id.*

The attempted return to work was unsuccessful: on August 17, Dr. Rikhy noted that Ms. Madrid had gone to work for four hours for two days and felt very fatigued, and her body aches and pains increased. AR 635.

Dr. Rikhy then referred Ms. Madrid to a specialist, rheumatologist Rajiv Dixit, M.D. AR 71. In his resulting consultation report, Dr. Dixit wrote to Dr. Rikhy that he had confirmed the diagnosis of fibromyalgia, and that Ms. Madrid was suffering among other things from chronic widespread pain, fatigue, and sleep disturbance. *Id.* Dr. Dixit's rheumatology consultation

summary that day noted fibromyalgia syndrome with chronic widespread pain, fatigue, sleep disturbance, depression and cognitive dysfunction.  AR 599.

On October 23, 2001, Ms. Madrid was examined again by Dr. Rikhy, who noted lots of abdominal pains.  AR 636.  On November 8, Dr. Rikhy noted pain in Ms. Madrid's right hand and in her abdomen.  AR 637.  On November 29, Ms. Madrid again consulted with Dr. Dixit, who noted fibromyalgia and decreased energy, as well as the presence of trigger points.  AR 603.

On January 8, 2002, Ms. Madrid was seen again by Dr. Rikhy, who noted Ms. Madrid was feeling better but that she also had a lot of body pain as well as pain in her right heel and right hand.  AR 578.  Ms. Madrid later followed up for her fibromyalgia again with Dr. Dixit, in October 2002.  AR 229.

> 2.     Ms. Madrid is referred for psychological counseling and briefly undergoes treatment

During the summer of 2001, Dr. Rikhy referred Ms. Madrid for a psychological consultation.  In an undated handwritten intake note, Carol Fabric, Ph.D., noted that Ms. Madrid was depressed, was dealing with some issues respecting her son's problems, and that the pain she was experiencing overwhelmed her.  AR 536-539.  In another handwritten note dated June 12, 2001, Carol Fabric noted Ms. Madrid's treatment for fibromyalgia syndrome, and that she was exhausted from having done the work of two people in Dionex' payroll department.  AR 540.  On June 19, Carol Fabric noted Ms. Madrid was taking medications for high blood pressure, anxiety disorder, pain, and major depression.  AR 541.  On July 9, 2001, Carol Fabric noted Ms. Madrid was "stopping calcium" to see if that was causing her joint pain.  AR 541.

Carol Fabric then referred Ms. Madrid to her husband, Bruce Fabric, M.D., a psychiatrist.  AR 532-534.  In a July 10, 2001 letter to Dr. Rikhy and Carol Fabric, Bruce Fabric advised Ms. Madrid was coming to him for "help with a bipolar disorder."  AR 532.  Bruce

Fabric noted that Ms. Madrid's "primary stressors" were her fibromyalgia and her son's difficulties. *Id.* His diagnosis included an Axis III indication of fibromyalgia, AR 533, and he prescribed medications to "stabilize mood, reduce obsessions and reduce pain from fibromyalgia." AR 534.

On July 23, 2001, Carol Fabric noted that Ms. Madrid didn't like the bipolar disorder diagnosis, and that she felt her difficulties were all due to fibromyalgia. AR 542.

### C. Ms. Madrid's LTD claim to RS

During the course of Ms. Madrid's claim RS generated seven denial or termination letters. The grounds for denial or termination were different every time.[2]

Of these, only the final two letters, RS' December 2003 termination letter, AR 145-147, and its August 2004 letter upholding that termination, AR 46-52, are the focus here, as those were the letters which conveyed RS' final determination and the letter upholding that determination on appeal. Because the previous letters bear on the standard of review, however, it is appropriate to briefly discuss them as well.

---

[2]

| Date | |
|---|---|
| July 17, 2002: | Claim denied because Ms. Madrid was not disabled and because she had not been under the continuous and regular care of her physicians. AR 95-99. |
| November 8, 2002: | Benefits limited to 24 months due to policy limitation for mental or nervous disorders. AR 209-210. |
| December 13, 2002: | Benefits limited to 24 months due to policy limitations for mental and nervous disorders and self-reported conditions. AR 208. |
| April 4, 2003: | Benefits limited to 24 months due to policy limitations for self-reported conditions; neck/back; and chronic fatigue syndrome. AR 205-206. |
| July 14, 2003: | Benefits limited to 24 months due to policy limitations for mental and nervous conditions; self-reported conditions; neck/back; chronic fatigue syndrome; additionally, claim might be subject to pre-existing condition exclusion, and Ms. Madrid may not be disabled. AR 148-154. |
| December 29, 2003: | Benefits limited to 24 months due to policy limitation for mental and nervous disorders. AR 145-147. |
| August 23, 2004: | Benefits limited to 24 months due to policy limitations for mental and nervous conditions; neck/back; and chronic fatigue syndrome. AR 46-52. |

1.     In July 2002, RS denies Ms. Madrid's claim, asserting she was not disabled

On October 29, 2001, Ms. Madrid completed her Employee's Statement in support of her disability claim to RS.  AR 76-78.  In an October 20, 2001 Physician's Statement, Dr. Rikhy described Ms. Madrid's disability to RS.  AR 84-85.  After conveying her diagnosis of fibromyalgia/anxiety/depression, AR 84, Dr. Rikhy stated:

> The patient has constant pain all over her body.  She is easily fatigued and has poor endurance.  The patient has trigger point pain / her blood pressure needs constant monitoring.

*Id.*

Matrix Absence Management, Inc., at the time, administered the Dionex LTD plan.  AR 302.  Upon receipt of Ms. Madrid's claim documents, Matrix commenced an immediate investigation into whether her claim was subject to the pre-existing condition (PEC) exclusion in the RS policy.  AR 296-297.  This investigation consumed some six months; in May 2002 Matrix determined the PEC exclusion did not apply and that it would – finally – "make final disability determination based on current information received."  AR 321-322.  Meanwhile, RS had advised Ms. Madrid that she "should apply for Social Security disability insurance benefits," AR 649, and provided her a flyer entitled "Advantages of Social Security Disability Benefits."  AR 650.

The medical records assembled by Matrix demonstrated that:

- Ms. Madrid had been experiencing constant pain all over her body and was easily fatigued.
- Objective medical findings included trigger point pain.
- Ms. Madrid was taking significant amounts of medication.
- Carol Fabric had opined that "ruling out the fibromyalgia, [Ms. Madrid's] severe mood destabilization is due to mood swings."

AR 331-333.  At least as early as March 8, 2002, and without any evaluation by any medical professional, RS decided Ms. Madrid's claim was "a M/N claim."  AR 327-328.

On May 21, 2002, Matrix' Brian Hepburn advised Ms. Madrid over the telephone that he had scheduled a review with "the medical review panel," that he was awaiting the "final review

notes," and that the "findings of the panel at the time of review confirm that the medical

information provided does not support [Ms. Madrid's] inability to work all the components of

[her] normal sedentary position." AR 263.[3]

Almost two months later, on July 17, 2002, Matrix wrote to Ms. Madrid, AR 95-99,

maintaining "you have not met the definition of disability as defined above and you have not

been under the continuous and regular care of your treating physicians. Therefore, we have

determined that you claim must be denied." AR 98. This letter had the prior approval of RS.

AR 320.

> 2.    In November 2002, RS approves benefits but limits them to 24 months
> under the limitation for mental and nervous disorders

On August 3, 2002, Ms. Madrid submitted an administrative appeal. AR 100-101. She

stressed "the main disabling condition that I have is the Fibromyalgia Syndrome." AR 100.

Her depression, she asserted, was a function of pain and fatigue from the fibromyalgia. *Id.*

She also provided a comprehensive list of her symptoms, including among others headaches

and dizziness; muscular pain all over her body; fatigue, and insomnia. AR 102. She also

provided a list of objective signs of her condition. AR 103.

On September 24, 2002, Ms. Madrid was awarded Social Security disability benefits,

effective November 2001. AR 221-224. On October 2, 2002, RS wrote to Ms. Madrid,

requesting that she provide a list of pharmacies she had patronized since August 2000 (an

inquiry obviously motivated by a renewed interest on RS's part in the PEC issue) and that she

provide a copy of her Social Security award letter. AR 214-215.

Ms. Madrid responded on October 7, 2002, with a list of pharmacies and a copy of the

---

[3]The record in this case is devoid of any such notes by any such "review panel," and RS has been
unable to provide any such documents in discovery. *See* Declaration of Richard Johnston Submitted by
Madrid in Support of Summary Judgment Motion (January 18, 2008) ("Johnston Declaration") at ¶2;
Exhibit A to Johnston Declaration, response to request No. 31. The record does, however, include
evidence of a cursory review by one registered nurse, conducted May 23, 2002, two days after Mr.
Hepburn had advised Ms. Madrid of the impending denial of her claim. AR 572.

1  Social Security correspondence.  AR 217-218.  She also pointedly reminded RS that Matrix

2  had already conducted an exhaustive investigation into PEC issues and concluded the

3  exclusion was inapplicable, and that she had been receiving regular treatment.  *Id.*

4      On October 29, 2002, RS's Denise Hein noted in Ms. Madrid's file that "in house

5  medical staff" had reviewed additional medical information.  AR 559.[4]  The only "review" of

6  any kind at this time, in fact, was a "Social Security Review" which occurred on October 29 as

7  well, AR 352; recall Ms. Madrid was by this time receiving Social Security disability benefits,

8  which had the effect of reducing the amount of monthly benefits payable by RS.  *See* AR 18

9  ("Other Income Benefits").

10     On October 29, Ms. Hein wrote to Ms. Madrid advising that "our original determination

11 should be reversed."  AR 104.  RS followed up on November 8, 2002, AR 209-210, advising

12 "benefits are payable for a maximum of twenty-four months (24) if a disability occurs as a

13 result of a mental or nervous disorder."  AR 209.  The letter went on: "As your benefits started

14 on November 28, 2001, the 24 month period will expire on November 28, 2004, [sic] or the

15 date you no longer meet the provisions of this policy, whichever comes first."  *Id.*

16

17     3.    In December 2002, RS changes its position and includes fibromyalgia as
             a disabling diagnosis, maintaining it is subject to a 24-month limitation for
18           self-reported conditions

19     On November 18, 2002, Ms. Madrid telephoned RS in response to its November 8

20 correspondence.  AR 248.  She maintained that her disabling condition was not a mental or

21 nervous disorder, but fibromyalgia.  *Id.*

22     On December 13, 2002, RS wrote again to Ms. Madrid, AR 208, this time "to advise you

23 of an error in the letter sent to you on November 8," and that "the primary diagnosis is Bipolar

24 Disorder, Anxiety, Depression and Fibromyalgia."  *Id.*  The letter added "Your claim will end on

25

26     [4]Again, there is no evidence of this medical review in the record, and RS has been unable to
       produce any in discovery.  *See* Johnston Declaration, ¶2; Exhibit A to Johnston Declaration, response to
27     request no. 33.

28

November 28, 2003 if you remain totally disabled and continue to meet the criteria for total disability.  The two year limit is for both Mental and Nervous disorders and Fibromyalgia, which is a Self-Reported illness."  *Id.*

            4.      In April 2003, RS limits Ms. Madrid's benefits to 24 months under limitations for self-reported conditions; neck/back; and chronic fatigue syndrome

On December 18, 2002, Ms. Madrid responded to RS's December 13 letter, again objecting to RS' assertion that her disability was caused by a mental or nervous condition.  AR 207.  Nothing transpired after that until, on April 4, 2003, RS wrote to Ms. Madrid with an "update to your appeal for limitation of benefits due to Mental/Nervous and Fibromyalgia limitations."  AR 205-206.

This time, RS did not assert any limitation at all for mental or nervous conditions, but instead discussed what its letter styled a "self-limiting disease or disorder."  AR 205.  The letter went on to describe policy limitations for chronic fatigue; environmental allergies; self-reported conditions; and neck/back.  *Id.*  Beyond that, the letter did not explain which of these various provisions applied to Ms. Madrid's claim, nor did it contain any other reasoning.  The letter concluded that Ms. Madrid's benefits would end on November 28, 2003, that she was "able to appeal this decision only at that time," and that the "appeal process starts on November 29, 2003, with a copy of your letter dated and postmarked at that time."  AR 206.

            5.      In July 2003, RS asserts various bases for claim termination: mental/nervous disorder; self-reported condition; neck/back; chronic fatigue syndrome; PEC exclusion; Ms. Madrid may not be disabled

        a. Ms. Madrid's April 2003 appeal

On April 14, 2003, Ms. Madrid sent a letter to RS appealing the decision in RS' April 4 letter.  AR 194-196.  She noted the very many instances in which RS had violated regulatory deadlines in processing her claim to date, AR 194; reiterated that her disabling condition was

fibromyalgia, not any mental or nervous disorder or any other malady, AR 194-195; provided

some additional information about fibromyalgia, AR 195-196; and concluded by asking RS to

"respond ASAP and do the right thing."  AR 196.

### b.  William Scott Hauptman, M.D.

In response to Ms. Madrid's April 2003 appeal, RS for the first time sought the opinion

of a physician; registered nurses had performed all previous evaluations.  On June 28, 2003,

William Scott Hauptman, M.D. generated a report of his review of Ms. Madrid's file.  AR 120-

127.[5]

Dr. Hauptman worked under a written contract with RS.  Johnston Declaration, ¶3;

Exhibit B to Johnston Declaration.  By this contract, Dr. Hauptman agreed to "participate in

performance of medical consultation and legal proceedings."  *Id.*, Exhibit B to Johnston

Declaration at 753.  Between 2001 and 2003, Dr. Hauptman's total compensation from RS

was $456,429.46.  Johnston Declaration, ¶4; Exhibit C to Johnston Declaration at 745-752.

Dr. Hauptman has achieved board certifications from the American Board of Quality

Assurance and Utilization Review; the American Board of Medical Review Officers; the

American Board of Internal Medicine in gastroenterology and in internal medicine; and the

National Board of Medical Examiners.  Johnston Declaration ¶5; Exhibit D to Johnston

Declaration at 744.  Insofar as his Curriculum Vitae reveals, he has no certification in

rheumatology or in psychiatry.

Dr. Hauptman's contract with RS, as noted, calls for him to provide medical

consultations and to participate in court proceedings.  Indeed, he has been no stranger to the

courts, who have readily discerned his undue bias against claimants.

[5]The record is devoid of any information on how the file came to be referred to Dr. Hauptman or what he was told by RS personnel about Ms. Madrid's claim, and RS has been unable to produce any such information during discovery.  Johnston Declaration, ¶2; Exhibit A to Johnston Declaration, response to request no. 36.

In *Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233 (D.Mass. 2003), for example, the court found Dr. Hauptman's analysis to be biased against Conrad in several respects:

> The central problem with the decision is its heavy dependence on the two reports produced by Dr. Hauptman, based on his review of the records of Conrad's treating and examining physicians. While it was reasonable for Reliance to rely on a medical examiner's review of Conrad's records, the reports Dr. Hauptman generated betray a palpable bias in favor of rejecting the claim. Repeatedly, Dr. Hauptman's conclusions select for emphasis just one or two elements of a medical report, while ignoring additional facts and important context. Although it would certainly be permissible for a reviewer such as Dr. Hauptman to summarize or condense the findings of other doctors, it was incumbent on him to do so in an even-handed and fair-minded manner, and it is clear that he did not.
>
> Several examples illustrate Dr. Hauptman's willingness to ignore factors favorable to the claimant while taking negative factors out of context and emphasizing them.

292 F.Supp.2d at 237-238. Among these examples was that Dr. Hauptman "uses bold face type and underlining to give prominence to his unfavorable interpretations, at the same time subordinating other of the treating psychiatrist's reported observations and conclusions." *Id.* at 238. The court found, in fact, that the "use of typographic emphasis suggests Dr. Hauptman's approach was that of an advocate speaking to persuade, rather than a medical professional seeking to evaluate." *Id.* "For Reliance to base its benefits decision on such tendentious reports was unreasonable." *Id.* at 240. *See also Smetana v. Reliance Standard Life Ins. Co.*, 2003 WL 22594263, at *7 (E.D.Pa.) (Dr. Hauptman's conclusions "in direct conflict with the opinions of the Plaintiff's physicians and carry some level of bias"); *Omasta v. The Choices Benefit Plan*, 352 F.Supp.2d 1201, 1209, 1211 (D.Utah 2004) (Dr. Hauptman's opinion "not reasonably based on the record" and "consists of discounting all of the substantial information supporting Plaintiff's claim of disability"; RS improperly "relied on Dr. Hauptman's cherry picking of the records to find all instances that he argued contradicted the limitations [prescribed by Omasta's treating physicians]").

In *Gunn v. Reliance Standard Life Ins. Co.*, 399 F.Supp.2d 1095 (C.D.Cal. 2005) (vacated on other grounds, 235 Fed.Appx. 553, 2007 WL 2326266 (9th Cir.)), the court again

1  discerned "some evidence in the record ... that suggests that Dr. Hauptman is still willing to

2  base his conclusions almost exclusively on the most optimistic data available," 399 F.Supp.2d

3  at 1105 n.8, and observed the *Conrad* court's criticism "focused on the fact that Dr. Hauptman

4  appeared to be a man with a mission – to find a way to justify a denial of benefits." *Id.* at

5  1105.

6  　　　The court also observed that "Reliance is the only insurance company for whom Dr.

7  Hauptman works, and he derives approximately one-third of his income from his work with

8  Reliance," *id.* at 1102, and discussed the response Dr. Hauptman and RS had to the *Conrad*

9  court's criticisms:

10  　　　In 2003, Hauptman was criticized by the District Court of Massachusetts in a published
　　　opinion for an obvious bias in favor of rejecting a claim for LTD benefits.  Reliance's

11  　　　sole response to this criticism was to note its agreement with Dr. Hauptman's suggestion
　　　that he stop using bold-faced type in certain areas because that was perceived by the

12  　　　Massachusetts court as evidence of bias.

13  *Id.*

14  　　　　　　　　　c.  Dr. Hauptman's report on Ms. Madrid's claim

15  　　　Dr. Hauptman started off by advising he had reviewed "all the medical records

16  submitted," AR 120, although elsewhere he indicated repeatedly that additional information

17  was required to allow for an informed analysis.  *See* AR 120 (I do not have any records

18  available for review from Dr. Carol Fabric.  Obtaining these could be helpful for further

19  evaluation of this file"); AR 121 ("I do not have any ENT records available for review.

20  Obtaining these could be helpful for further evaluation of this file"; "**Obtaining all medical**

21  **records from all treating physicians at Stanford will be important for further evaluation**

22  **of this file**") (emphasis in original); AR 122 ("Obtaining all records beginning October, 2000,

23  including but not limited to the time interval February through May, 2001 will be important for

24  further evaluation of this file"; "**Obtaining physical therapy records will be important for**

25  **further evaluation of this file**") (emphasis in original); AR 123 ("Pharmacy records should be

26  obtained and reviewed from the time period beginning no later than August 2000"); *see also*

27

28  _____
POINTS AND AUTHORITIES SUPPORTING
PLAINTIFF'S MOTION FOR JUDGMENT
UNDER RULE 56 OR RULE 52                    12

1    AR 127 (reiterating recommendations to obtain records from Stanford, both Fabrics, physical

2    therapy, and ENT consult).

3         Aside from these serial recommendations to obtain additional information, Dr.

4    Hauptman discussed a passage in one of Ms. Madrid's communications wherein she

5    characterized fibromyalgia as a "type of arthritis." AR 120. He explained in some detail that

6    he believed Ms. Madrid had omitted material qualifying information:

7         The patient's omission of the phrase "and rheumatic diseases" leaves the incorrect
          impression that the authors mean to indicate that fibromyalgia is a form of arthritis.
8         **Insofar as there is no inflammation of the joints noted in fibromyalgia, fibromyalgia
          is clearly not a form of arthritis but is rather classified as a rheumatic condition, as**
9         **correctly noted by the authors.**

10   AR 120 (emphasis in original). He went on to say, echoing the corresponding RS policy

11   limitation, "Fibromyalgia is therefore a condition caused and contributed to by musculoskeletal

12   and connective tissue disorders of the cervical, thoracic and lumbosacral regions and their

13   surrounding tissue." AR 120.

14        Dr. Hauptman next turned to offering RS advice on investigative leads which might

15   allow it to successfully invoke the PEC exclusion, noting instances where he would surmise

16   Ms. Madrid obtained treatment during the pertinent time period. *See* AR 121.

17        Dr. Hauptman noted findings of "a lot of pain all over her body"; an unsuccessful

18   attempt to return to work; a significant medication regimen; headache, dizziness and fatigue;

19   abdominal pain; and hand and abdomen pain; as well as documented diagnoses by treating

20   medical providers of fibromyalgia. AR 124-125. Along the way, he singled out certain physical

21   examinations, such as one occurring on August 30, 2001 by Dr. Dixit, and commented "**This**

22   **physical examination is not consistent with impairment from sedentary work**." AR 124

23   (emphasis in original).

24        Next came Dr. Hauptman's assessment. First, he opined the "medical records clearly

25   document underlying psychiatric disease including depression and bipolar disorder." AR 125.

26   That notwithstanding, he concluded "there are no medical records presented for review that

27

28

1   enable a determination of the presence or absence of impairment secondary to the psychiatric

2   disease." *Id.* Acknowledging that Ms. Madrid had been diagnosed with fibromyalgia, Dr.

3   Hauptman countered "it is my opinion within a reasonable degree of medical certainty that

4   medical records do not support impairment secondary to these underlying musculoskeletal

5   complaints. There were no objective studies presented for review that would be supportive of

6   impairment from sedentary work." AR 125-126. He continued:

7        In the medical records provided, it is difficult to state which is the patient's primary
         diagnosis. The documentation of a bipolar psychiatric disorder as well as the patient's
8        appearing tearful on numerous occasions suggest the primacy of the psychiatric condition.
         However as noted above, records currently presented for review do not document
9        impairment predicated upon either of those conditions. The documentation of psychiatric
         illness including depression and bipolar disorder does suggest the possibility of
10       impairment consequent to this condition.

11       There is currently no evidence in the medical records that the patient's presentation with
         physical symptoms is uniquely on the basis of underlying psychiatric disease. If this
12       specific determination of the contribution by a mental nervous disorder to the patient's
         physical presentation is desired, then consideration can be given to proceeding with
13       neuropsychological testing including an MMPI Personality Profile.

14  AR 126. He went on: "given the American College of Rheumatology classification of this

15  disorder, it is difficulty [sic] to characterize fibromyalgia as a 'self reported condition.' However

16  ... fibromyalgia is a condition that is caused or contributed to by musculoskeletal and

17  connective disorders of the neck and back...." AR 126.

18       On July 1, 2003, Dr. Hauptman billed RS for three hours of professional time in Ms.

19  Madrid's matter, for a total of $1,050. AR 558.

20

21                   d.  RS upholds the termination of benefits

22       On July 14, 2003, Karen McGill of RS sent a letter to Ms. Madrid, upholding the

23  decision to terminate her benefits after 24 months. AR 148-154. This time, RS invoked

24  virtually every ground allowed in its policy to limit benefits, and a couple which might allow

25  denying them altogether.

26       First, despite Dr. Hauptman's admonishment that fibromyalgia could not be considered

27

28

to be "self reported," RS asked Ms. Madrid to "note that these symptoms are identical to those listed in the definition of a self-reported illness."  AR 150.

Next, RS invoked the mental/nervous limitation, asserting with regard to Ms. Madrid's psychological issues "While they may or may not be the primary cause of your disability, they clearly contribute to your status.  Please note that the policy specifically limits benefits for conditions caused by or *contributed to by* mental or nervous disorders."  *Id.* (emphasis in original).

Next, RS asserted that a diagnosis of chronic fatigue syndrome which had at one point been noted by Dr. Rikhy was subject to a policy limitation for that condition, and stressed the "24 month limitation on disabilities caused by or *contributed to by chronic fatigue syndrome.*"  *Id.* (emphasis in original).

Next, citing Dr. Hauptman's report, RS asserted the fibromyalgia diagnosis was subject to the neck/back limitation as well.  AR 151.  RS summarized:

> It is apparent from reviewing your medical records that while various diagnoses, including chronic fatigue, depression, anxiety and bipolar disorder, may or may not be individually disabling, they certainly contribute to your overall condition.  Furthermore, fibromyalgia is a condition caused by or contributed to by musculoskeletal and connective disorders of the neck and back.

*Id.* That was not all.  RS went on to advise "additional investigation of your claim is necessary to determine whether your condition was pre-existing and whether you remain Totally Disabled as defined by your policy."  AR 154.  Finally, RS advised Ms. Madrid that its "claim decision is now final, as you have exhausted any administrative remedies available."  *Id.*

> 6.    In December 2003, RS again upholds the termination of Ms. Madrid's benefits, citing only the mental/nervous limitation

The next day, on July 15, Ms. McGill generated a "Quality Review Summary."  AR 310. Even though she had just finished telling Ms. Madrid that the file was closed and all administrative remedies were exhausted, she launched a new investigation to see if benefits could be denied to Ms. Madrid altogether:

> On appeal numerous issues arose as to the claimant's eligibility for benefits. I recommend that the examiner review both my letter to the claimant and Dr. Hauptman's review for a complete understanding if these issues. In particular it is recommended that the examiner consider whether the claimant's condition was pre-existing in nature and whether the claimant meets the definition of total disability. In doing so, it is recommended that additional medical records be obtained....

*Id.* RS did indeed employ measures to obtain additional records. *See* AR 156-160; *see also* AR 307.

So far as the record discloses, such records were never considered by anyone at RS. Rather, on December 29, 2003, RS wrote again to Ms. Madrid, AR 145-147, telling her it was "happy to have been of service to you these past few years," and advising her "benefits cease at the end of 24 months because of the mental nervous limitation, November 28, 2003." AR 145. The letter also assured Ms. Madrid that RS had "used all appropriate guidelines and policy provisions in reviewing your claim," *id.*, and invoked no ground other than the mental/nervous limitation for limiting benefits.

> 7.    In August 2004, RS upholds the termination of Ms. Madrid's benefits invoking the mental/nervous, neck/back, and chronic fatigue policy limitations

On April 19, 2004, Ms. Madrid appealed the decision in RS' December 2003 correspondence. AR 64-70. She again recounted the many respects in which RS had violated regulatory and contractual time limits for claim and appeal processing, AR 64-65; reminded RS that it had already investigated and rejected the PEC exclusion, AR 65; reiterated that "Fibromyalgia Syndrome is the main disabling condition that I have," AR 67; provided some additional information about fibromyalgia, AR 67-69 (including that fibromyalgia "is characterized by **WIDESPREAD** pain, not just the neck and back," AR 68 (emphasis in original)); and requested that the decision to terminate her benefits in November 2003 be reversed. AR 69.

On May 11, RS generated an appeal referral, in which it indicated "Because of findings in file, we imposed the limitations due to M/N disorder," AR 62, and that the "final

1  determination was denial due of [sic] due to bipolar situation; anxiety, depression; distress

2  level with mania at least two times per year, etc." *Id.*

3      Ms. Madrid's file was ultimately referred to Kevin P. Hayes, M.D., a psychiatrist and

4  neurologist. AR 453-456. Dr. Hayes had previously served as Vice-President and Medical

5  Director for UNUMProvident Corporation, *see* Johnston Declaration, ¶6; Exhibit E to Johnston

6  Declaration,[6] a company which had become notorious for "boost[ing] its profits by repeatedly

7  denying claims it knew to be valid." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, -

8  F.3d -, 2008 WL 80704, at *2 (9th Cir.). This information, however, was conspicuously omitted

9  from the Curriculum Vitae included in the record. *See* AR 453-456.

10     Although there is nothing in the record describing the assignment forwarded to Dr.

11 Hayes on RS' behalf, it is evident he was not asked to opine at all about Ms. Madrid's physical

12 infirmities. His August 15, 2004 report indicates "The purpose of this review is to evaluate her

13 claim of psychiatric disease, and its impact (if any) on her occupational functioning," AR 457,

14 and otherwise demurs: "I will defer an opinion on the claimant's physical symptoms/conditions

15 to the appropriate medical specialists," AR 465; "Again, I would defer any opinion on the

16 claimant's physical symptoms to the appropriate specialists...." *Id.*

17     What Dr. Hayes did do was to opine that Ms. Madrid was indeed disabled

18 psychologically, and that any physical maladies were co-morbid, i.e. distinct[7] from her mental

19 or nervous issues:

20         The claimant has tried to cite the mood and anxiety symptoms as a <u>component</u> of her
            alleged fibromyalgia disease. I am not aware of anxiety and depression being
21         components of fibromyalgia. However, while someone with a chronic illness might have
            some low-grade symptoms, I feel <u>this</u> clinical picture reflects mood and anxiety
22

23         [6]This exhibit is a copy of the Alumni Newsletter for Dr. Hayes' alma mater, University of
       Pittsburgh School of Medicine, *see* AR 453,obtained from the internet. The court is requested to take
24     judicial notice of this material. *See Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 966-967 (C.D.Cal.
       2005).
25
           [7]A 'comorbid' condition is one which is "a concomitant but unrelated pathologic or disease
26     process; usually used in epidemiology to indicate the coexistence of two or more disease processes."
       *Dames v. Paul Revere Life Ins. Co.*, 12 Fed.Appx. 505, 508 (9th Cir. 2001).
27

28 _____

complaints that reached a threshold to qualify them as an <u>independent comorbid condition.</u>

AR 465 (emphasis in original).  Dr. Hayes concluded "the medical records in the record do document a disability that is caused by or contributed to by a mental or nervous disorder – the bipolar disorder."  AR 466.

On August 23, 2004, with Dr. Hayes' report in hand, Ms. Angiolillo wrote to Ms. Madrid with RS' final word on the termination of her benefits.  AR 46-52.  This time, RS upheld the termination of benefits based on the mental/nervous, neck/back, and chronic fatigue limitations.

Respecting the mental/nervous limitation, Ms. Angiolillo provided another overview of the medical records, AR 48-49, and parroted some of Dr. Hayes' verbiage, AR 49-50, before concluding:

> While you assert that your mental health diagnoses are not your primary disabling condition they clearly contribute to your status.  The Policy specifically limits benefits for conditions caused by or *contributed to by mental or nervous disorders* (emphasis added), and your eligibility for payment of LTD benefits under this provision terminated on 11/28/03 (the end of 24 months).

AR 50 (emphasis in original).

Respecting the neck/back limitation, Ms. Angiolillo wrote:

> As argued previously by Ms. McGill on 7/14/03, "Because fibromyalgia is not a form of arthritis, it would not fall under the list of musculoskeletal and connective disorders excluded from the 24 month limitation.  Indeed, it would be subject to the 24 month limitation of Total Disabilities cause or contributed to by musculoskeletal and connective disorders of the neck and back."  As part of this review, we have not reviewed any information which would sway our position as documented by Ms. McGill.

*Id.*  Finally, respecting the "chronic fatigue" limitation, Ms. Angiolillo wrote:

> In addition to a diagnosis of fibromyalgia, medical records document an assessment of chronic fatigue syndrome by Dr. Rikhy.  Again, we refer you to the **LIMITATIONS-OTHER LIMITED BENEFITS** provision as defined in the group Policy, which specifically limits benefits on disabilities caused by *or contributed to by chronic fatigue syndrome* (emphasis added).  Therefore, this limitation applies to your claimed disability, and since you ave already received the maximum benefit of 24 months, your eligibility for payment of LTD benefits under this provision terminated on 11/28/03.

AR 50-51 (emphasis in original).  Ms. Angiolillo concluded:

While we understand that you may continue to be impaired from your psychiatric disorder or have physical complaints which are *"caused by or contributed to by"* your psychiatric disorders, you have already been compensated for the aggregate lifetime maximum duration of twenty-four (24) months as set forth in the Limitations Policy provision as quoted in the body of this letter.

AR 51 (emphasis in original).

This action ensued.

IV.     Discussion

A.     The court should afford scant deference to RS' determination

RS, in its policy, granted unto itself "the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." AR 14. RS, as both the insurer, AR 4, and the self-anointed "claims review fiduciary," AR 14,[8] labors under a conflict of interest which requires the court to conduct a review for abuse of discretion "informed by the nature, extent, and effect on the decision-making process" of that conflict. *Abatie v. Alta Life & Health Ins. Co.*, 458 F.3d 955, 965, 967 (9th Cir. 2006) (*en banc*). In such a review, the "deference [a court accords] to a claims administrator's decision can vary significantly," because a "danger pervades the ERISA-plan world that a self-interested plan decisionmaker will take advantage of its license under [deferential judicial review] to line its own pockets by denying meritorious claims." *Saffon, supra,* 2008 WL 80704 at *2 (quoting Langbein, <u>Trust Law as Regulatory</u>

---

[8]The fact that RS granted itself discretion in its policy weighs against deferential review. The degree of appropriate deference is analyzed according to comment d to section 187 of the Second Restatement of Trusts. *See Saffon, supra,* 2008 WL 80704 at *2. Factor (3) of that comment is "the nature of the power" granted to the trustee. When an insurer puts language into an insurance policy by which it confers discretion upon itself, it is doing so patently for its own benefit, and for the benefit of no one else. Therefore, at its very inception this discretionary power is the result of self-serving conduct which, while perhaps not subject at that time to strict fiduciary requirements, is nonetheless antithetical to such responsibilities: the insurer is building in an escape hatch calculated to shield its conduct from any but the most deferential judicial review, facilitating avoidance of the fiduciary responsibilities it is about to undertake. Moreover, given that many states have determined that a grant of discretion renders the entire insurance policy illusory, *see Saffon* at 80704, *2; *Mitchell v. Aetna Life Ins. Co.*, 359 F.Supp.2d 880, 888 (C.D.Cal 2005), an insurer's exercise of self-conferred discretion should be viewed skeptically lest promised insurance protection be unduly squelched.

Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA, 101

NW. U.L.Rev. 1315, 1321 (2007)).

Therefore, a court will weigh a conflict of interest heavily if:

...there's evidence that the administrator has given inconsistent reasons for denial, has failed adequately to investigate a claim or ask the plaintiff for necessary evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly.

*Saffon*, 2008 WL 80704 at *3. Another factor calling for skeptical review is that the insurer has

"repeatedly denied benefits by ... making decisions against the weight of evidence in the

record." *Abatie*, 458 F.3d at 968-969.

Here, for a number of reasons, the deference afforded to RS' determination should be

very, very low.

First, RS gave many inconsistent reasons for claim denial or termination. As described

above, every time RS sent a letter describing the basis for its decision, the reasons changed.

Second, RS failed to adequately investigate the claim in many respects. Dr.

Hauptman's report, for example, suggested many respects in which the claim file was

incomplete and in which additional information would be beneficial. Although RS did

apparently take some steps to obtain the information suggested by Dr. Hauptman, the record

is devoid of any indication anyone at RS ever looked at it. Rather, RS simply farmed out the

file to Dr. Hayes and uncritically adopted his views in affirming the termination of Ms. Madrid's

benefits.

Third, as the evidence discussed above in connection with Dr. Hauptman's conduct

demonstrates, RS has repeatedly, and consciously, denied meritorious claims. Indeed, when

its conduct was condemned by the *Conrad* court, its response was merely to adopt Dr.

Hauptman's suggestion that he stop bold-facing his reports in order to highlight passages most

injurious to claimants. RS' response, then, was not to clean up its act, but to cover its tracks;

there is no indication any substantive reform was even considered. Above and beyond RS'

continuing employment without more of Dr. Hauptman, then, this conduct betrays a corporate

1  mindset quite reminiscent of the danger posed by self-interested plan decisionmakers

2  discussed by the *Saffon* panel.

3     There are quite a few other instances of conduct on RS's part which are at best

4  questionable.  Examples are: RS produced a Curriculum Vitae for Dr. Hayes which

5  conspicuously omitted any reference to his tenure with the rouge UNUMProvident entity.  It

6  rushed to judgment on Ms. Madrid's claim; as early as March 8, 2002, and with no input at that

7  point from any medical professional, it had already decided Ms. Madrid had tendered a "M/N"

8  claim.  It persisted in trying to shoehorn Ms. Madrid's claim into the PEC exclusion, despite

9  previous unsuccessful attempts to do so on Matrix' part.  It produced an administrative record

10 lacking pertinent information about various decisions and referrals to medical reviewers.  *See,*

11 *e.g.,* notes 3, 4, 5, *supra.*

12    The court should afford little, if any, deference to RS' determinations in this matter.  *See*

13 *Abatie*, 458 F.3d at 968-969; *Saffon*, 2008 WL 80704, at *7-*8.

14

15    B.    Ms. Madrid's mental and nervous diagnosis does not and cannot mean she is
          ineligible for benefits for an entirely distinct physical disability

16    RS reached the conclusion it did respecting the mental/nervous limitation by the simple

17 device of deciding that Ms. Madrid's diagnosis with mental or nervous conditions necessarily

18 rendered irrelevant that she had another physical condition which was independently disabling

19 in itself.  RS maintained that Ms. Madrid's fibromyalgia "may or may not be" disabling, but it

20 didn't matter, because she also had psychological issues which "contributed to" something RS

21 styled her "status."  AR 150; AR 50.

22    Thus, according to RS' analysis, a claimant confined to an iron lung would have

23 benefits cut off after 24 months if they also happened to be diagnosed with depression.  After

24 all, the depression would "contribute" to the claimant's "status," so according to RS the fact the

25 claimant would be physically incapacitated for life would be irrelevant.

26    RS's interpretation is contrary to law.  An independently disabling condition is not

27

28
_____
POINTS AND AUTHORITIES SUPPORTING
PLAINTIFF'S MOTION FOR JUDGMENT
UNDER RULE 56 OR RULE 52                    21

1  "contributed to" by a comorbid psychological diagnosis (precisely what Dr. Hayes found, AR

2  465) for purposes of limiting provisions such as the one in this case.

3        Before turning to legal principles as such, it is noteworthy that RS itself has previously

4  taken a position precisely opposite to the one it takes now.  In *Gatti v. Reliance Standard Life*

5  *Ins. Co.*, 2006 WL 664422 (D.Ariz.), the underlying benefit plan, which had been issued to

6  PaineWebber Group, Inc., 2006 WL 664422 at *2, contained precisely the same language in

7  terms of a mental/nervous limitation as the one in this case: it provided that benefits were

8  limited to 24 months if a mental nervous disorder "caused or contributed to" Total Disability.

9  Johnston Declaration, ¶7; Exhibit F to Johnston Declaration at 18.  In the *Gatti* matter, RS

10  "conceded that benefits are still payable beyond the mental/nervous disorder limitation if the

11  individual remains totally disabled due to the physical condition.  Thus, even if Gatti had a

12  disabling bipolar disorder, she would still be entitled to benefits, under [RS'] interpretation of its

13  policy, if she remained totally disabled due to hepatitis B symptoms."   2006 WL 664422, at *4

14  (internal citations and punctuation omitted).  Inasmuch as an ERISA plan administrator is

15  required to ensure that plan provisions have been applied consistently with respect to similarly

16  situated claimants, 29 CFR §2560.503-1(b)(5), it ought not now be heard to contradict the

17  position it adopted in *Gatti*.

18        Turning to legal principles, when interpreting the mental/nervous limitation in RS' policy,

19  ambiguous terms are to construed against RS and in favor of Ms. Madrid.  *See, e.g., Mogck v.*

20  *UNUM Life Ins. Co. of America,* 292 F.3d 1025, 1029 (9th Cir. 2002).  Moreover, "courts will

21  protect the reasonable expectations of insureds even though a careful examination of the

22  policy provisions indicates that such expectations are contrary to the expressed intention of

23  the insurer."  *Henry v. Home Ins. Co.*, 907 F.Supp. 1392, 1396 (C.D.Cal 1995) (internal

24  citations and punctuation omitted).  In *Henry*, an accident policy provided coverage only for

25  bodily injury which was "a direct result, independent of all other causes," of a covered hazard.

26  *Id.* at 1394.  Home maintained Henry's eye injury was not covered because, even though he

27

28

1  had been injured in a fall, a pre-existing glaucoma condition was also involved, such that his

2  injury was not caused by the fall independent of all other causes.  *Id.*

3       "Home," according to the court, "interprets this phrase quite literally, and denies

4  coverage for injuries that are related to a pre-existing medical condition."  *Id.*  This the court

5  would not allow Home to do:

6       People buy accident insurance to be covered for injuries arising out of an accident;
     reasonable people do not contemplate that a minor or dormant pre-existing condition will

7       defeat the protection of such insurance.  If the phrase is given literal effect, only the
     healthiest of individuals would be given the protection of their policies.  Those suffering

8       from even the slightest pre-existing medical conditions would be precluded from benefits
     – the purchased coverage would be illusory.  The court will not construe the contract to

9       defeat, rather than promote, the purpose of accident insurance.  The court therefore
     concludes that literal application of the phrase "direct result, independent of all other

10       causes" defeats the reasonable expectations of insureds.

11  *Id.* at 1397.  The same principle applies here – to apply the mental/nervous limitation in the

12  manner urged by RS would render promised coverage for physical disabilities beyond 24

13  months wholly illusory if the claimant just happened to have a comorbid mental or nervous

14  condition.  An insured's reasonable expectations would not contemplate such a result.

15       Other verbiage in the RS policy buttresses this point.  The policy's definition of disability

16  connotes one condition causing a disability, as where it speaks in such terms as "Totally

17  Disabled as the result of a Sickness of Injury," AR 18, or "as a result of an Injury or Sickness."

18  AR 11.  Nowhere in these provisions is there any contemplation of a claimant's "status" as

19  evaluated by an amalgam of various conditions, any one of which may be totally disabling in

20  itself.  Rather, the policy contemplates that a Total Disability is that which is caused by "a

21  Sickness or Injury" or "and Injury or Sickness."

22       In *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y. 2005), the

23  MetLife policy provided that disability benefits would be cut off after two years if a disability "in

24  any way results from, or is caused or contributed to by a mental or nervous disorder."  *Id.* at

25  263.  Sheehan suffered from coronary artery disease, and comorbidly from cardiac neurosis;

26  the latter was a mental or nervous condition.  *Id.*  The court interpreted the MetLife provision to

27

28

1    mean "entitlement to disability benefits under the Plan exists only if the cardiac condition by

2    itself would constitute a total disability." *Id.* at 264.  Sheehan lost, not because he had

3    neurosis, but because it was "quite apparent that without the comorbid contribution of

4    Sheehan's cardiac neurosis to his condition, he would not presently be totally disabled." *Id.* at

5    265.

6        That is precisely the question RS never asked in this case: whether, without the

7    mental/nervous condition, Ms. Madrid would be totally disabled from her fibromyalgia, despite

8    serial indications from her treating physicians that the fibromyalgia was disabling in itself.[9]

9    Instead, it decided the presence, without more, of the comorbid mental and nervous condition

10    trumped any potential physically-based disability Ms. Madrid may have.  In so doing, and

11    especially in view of the skeptical judicial review its conduct merits, it abused its discretion.

12

13        C.     Ms. Madrid's fibromyalgia is not a condition of the neck and back

14        The court may resolve this issue summarily.  The RS policy limits benefits to 24 months

15    for "musculoskeletal and connective disorders of the neck and back..."  AR 22.  Fibromyalgia

16    is not such a disorder.  Rather, it:

17            ...causes inflammation of the fibrous connective tissue components of muscles, tendons,
            ligaments, and other tissue.  Common symptoms ... include chronic pain *throughout the*
18            *body*, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can
            exacerbate the cycle of pain and fatigue associated with this disease.

19    *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (emphasis added).  Fibromyalgia, then,

20    is not limited to the neck and back, and, especially interpreting the provision in question in Ms.

21

22    —————————

23        [9]Dr. Hauptman, of course, expressed significant skepticism (in bold-face type) in his report, but
   he ultimately recommended that RS secure additional information before an informed opinion could be

24    rendered.  Following receipt of his report, RS at no point determined Ms. Madrid was not disabled from
   fibromyalgia; the closest it came was to advise her in July 2003 that "additional investigation of your

25    claim is necessary to determine whether ... you remain disabled as defined by your policy."  AR 154.  Dr.
   Hayes, for his part, expressly disclaimed any opinion on any physical disability.  The various

26    submissions from her treating physicians (including Dr. Dixit, who possesses expertise in rheumatology
   and fibromyalgia which Dr. Hauptman and Dr. Hayes lack), meanwhile, indicated she was indeed

27    disabled as a function of her fibromyalgia.

28    —————————
   POINTS AND AUTHORITIES SUPPORTING
   PLAINTIFF'S MOTION FOR JUDGMENT
   UNDER RULE 56 OR RULE 52        24

Madrid's favor and against RS, the 24-month limit for such conditions is inapplicable.[10]

V.    Conclusion

Based on the foregoing, the court should grant Ms. Madrid's motion in all respects and render judgment in her favor, awarding her disability benefits which have accrued since RS terminated her benefits, pre- and post-judgment interest, costs of suit, and attorney fees to be adjudicated on post-judgment motion.

Dated: January 18, 2008

                                    _____/s/_____
                                    Richard Johnston
                                    Attorney for Plaintiff
                                    Arminda Y. Madrid

---

[10]RS also terminated benefits because one of Ms. Madrid's physicians had considered a diagnosis of chronic fatigue syndrome.  It was no more proper to do so because of that comorbid condition, however, than it was to do so because of the comorbid mental and nervous conditions, for all of the same reasons.